# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JOEL PRATE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 6554 |
| | ) | |
| **CAROLYN W. COLVIN**, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Joel Prate ("Prate") seeks judicial review pursuant to the Social Security Act ("Act"),

more specifically 42 U.S.C. §§ 405(g) and 1383(c)(3),[1] of the final decision by Acting

Commissioner of Social Security Carolyn Colvin ("Commissioner") that denied Prate's claim for

disability insurance benefits under Titles II and XVI of the Act. Prate and Commissioner have

filed cross-motions for summary judgment under Fed. R. Civ. P. 56. Prate asks this Court to

reverse Commissioner's decision and award benefits to Prate or, in the alternative, to remand the

case for further proceedings. Commissioner's motion asks this Court to affirm her denial of

benefits. For the reasons stated in this memorandum opinion and order, Commissioner's motion

is denied, Prate's motion is denied in part and granted in part, and the case is remanded for

further proceedings consistent with this opinion.

---

[1] All further statutory references will take the form "Section --," using the Title 42
numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited
"Reg. § --."

## Procedural Background

Prate filed applications for social security disability insurance benefits ("SSDI") and supplemental security income ("SSI") on November 2, 2011, alleging a disability onset date of April 15, 2006 (R. 14). Those applications were denied on December 15, 2011 and again denied upon reconsideration on May 14, 2012 (<u>id.</u>). Prate then made a timely filing for a hearing, and Administrative Law Judge Joel Fina ("ALJ Fina" or simply "the ALJ") held a first hearing on October 2, 2012, followed by a supplemental hearing on February 4, 2013 (R. 14-15). On April 3, 2013 the ALJ issued a decision denying Prate's applications (R. 35). Prate requested review from the Appeals Council, but it denied his request for review on July 12, 2013 (R. 2). Thus ALJ Fina's opinion represents Commissioner's final decision.

## General Background

Prate, born on December 17, 1958, was 54 years old on the date ALJ Fina decided he was not disabled (R. 35, 255). Prate is a military veteran who has been homeless for some time (R. 101-2, 181, 7537). He is divorced and has two adult children, neither of whom lives with him (R. 135-36). From 2006 to 2009 he worked only occasionally, mostly as a truck driver (R. 108). In 2009, his last year of work, he made $4,293.68 (R. 291). Aside from driving trucks and his brief stint in the military, Prate also worked as a salesman and an exterminator (R. 104-7). He obtained a GED before entering the service, and that was the extent of his formal education (R. 103).

Prate supported his applications with medical records totaling about 8,500 pages. Those records evidence a number of maladies that Prate argues render him unable to work. Most prominent among them are chronic leg and lower back pain, coronary artery disease with angina and two heart attacks, a history of pulmonary embolisms, chronic obstructive pulmonary disease

and psychiatric symptoms (principally anxiety and depression) (R. 18, 30-34). Aside from that, the records are particularly notable for the red flags they raise about Prate's credibility. He has not always complied with doctors' advice, he has sometimes used prescription opioids in doses beyond those prescribed (resulting in one overdose), and for a time he incessantly reported to various hospital emergency departments, complaining of exacerbated back pain and requesting (sometimes demanding) large doses of powerful opioids (R. 18-23, 26-30). Such visits to emergency departments provide most of the bulk of the administrative record.

**Medical Evidence**

Besides the sheer size of the record, two factors have made any review of the medical evidence particularly difficult. One is the disorganization of the record. At times records from a single hospital admission are scattered across multiple exhibits and record volumes, apparently at random. Such disorganization always presents problem for a reviewing court (not to mention an ALJ), but that is especially so when the record stretches over 9,000 pages. Also complicating any review is that Prate apparently never established a continuing relationship with a treating physician -- instead he serially sought treatment from several hospital emergency departments. Thus the extensive records that do exist reflect no developing understanding of Prate's apparently complex and interrelated medical issues, but instead mostly evidence a number of unrelated physicians' first impressions of Prate and his problems. There is no elegant way to summarize such information, but this opinion will proceed by giving a brief history of each impairment that formed a basis for the ALJ's determination, which Prate now challenges on appeal.

Prate's main complaint has been intense, burning pain that extends from his lower back through his left leg and into his left foot and toes (R. 77, 115-16). He states that this pain, combined with shortness of breath (brought on by one or both of his coronary artery disease and

chronic obstructive pulmonary disease), makes it difficult for him to walk any more than short distances and often causes him to fall (R. 115-16, 131). Although at times the record includes Prate's reports that he has experienced back pain throughout his life, the burning-type pain first arose in 1999 and has persisted since (R. 4890). Not coincidentally, that is the year Prate had spinal fusion surgery, apparently to relieve pain as well as bowel and bladder incontinence (id.). That surgery fused Prate's fifth lumbar ("L5") and first sacral ("S1") vertebrae by means of a metal plate and screws (R. 64, 7453).

From the alleged disability onset date in 2006 to the final hearing date in 2013, Prate presented at various emergency departments dozens of times, complaining of incapacitating pain in his back and legs (usually his left leg) and occasionally complaining of numbness or tingling in the same. Those complaints were not always supported by objective findings. For instance, absent or reduced reflexes were noted in one or both of Prate's lower extremities on May 4, 2008 (R. 818), November 10, 2009 (R. 4123), November 7, 2011 (R. 4891) and November 28, 2011 (R. 1746), among other visits. But at other times Prate's lower extremity reflexes were within a normal range, for example on October 11, 2009 (R. 5994) and May 22, 2010 (R. 3706). Similarly, hospital staff sometimes observed muscle spasms with a reproducible "trigger point" in Prate's back, as on May 23, 2007 (R. 5040) and February 17, 2010 (R. 5932), but they sometimes did not, as on October 11, 2009 (R. 5994).

Prate also occasionally complained of incontinence. As to bowel incontinence he complained three times, once in an emergency room visit on August 11, 2006 (R. 4896), again on June 15, 2007 (R. 1156) and again (this time with bladder incontinence as well) on March 18, 2009. Prate also told medical staff of bladder incontinence after an asserted aggravation of his back pain on February 14, 2011 (R. 6638). Finally, a doctor ordered a CT scan and MRI on

August 24, 2012 because of bladder incontinence -- though it is unclear whether that incident was observed by the doctor or just reported by Prate (R. 7499).  So far as this Court can tell, Prate did not complain of incontinence at other times, nor did hospital staff observe any.

During his frequent visits to hospital emergency rooms Prate received numerous MRIs, CT scans and x-rays of his back.  Unfortunately, reports from the MRI and CT scans consistently noted that it was difficult or impossible to obtain useable images of the tissue between and around the very three vertebrae that would seem to be the source of the pain Prate described (the L4, L5 and S1 vertebrae) because of the metal "artifacts" there:  the plate and screws fusing Prate's lower spine (R. 831-33, 1184, 1786-88, 3066, 4864, 5078, 5237-38, 5870, 6862-63, 7453-54).

But when radiologists were occasionally able to get a peek at Prate's lower spine in spite of the metal there, they made potentially noteworthy findings.  On August 18, 2009 the radiologist performing a CT scan noted Prate had a perineural cyst (i.e., a cyst next to a nerve) near his L4 vertebra (R. 1787-88).  On October 29, 2010 an MRI revealed facet hypertrophy (degeneration of the vertebral joints) between L4 and L5 (R. 6862-62).  And on January 11, 2011 another radiologist performing a CT scan noted possible bony narrowing of the neural foramina (R. 5870).  Aside from those glimpses, radiological findings were mostly limited to gross findings or to other parts of Prate's spine and nearby tissue.  On that score CT scans and MRIs consistently reflected a grade I or II spondylolisthesis (a mild to moderate displacement) of Prate's L5 vertebra relative to his S1 vertebra, reflecting the position in which the two bones were fused (e.g. R. 5078, 5237-38, 7454).  Back on July 23, 2007 a CT scan had revealed calcification of the arteries (atherosclerosis) near Prate's spine (R. 5078).  Disc degeneration was generally noted on May 6, 2008 (R. 833), June 30, 2009 (R. 5237-38) and August 6, 2012

(R. 7453), with disc bulging noted in particular on August 20, 2009 (R. 1746-47) and August 6, 2012 (R. 7453).

Apart from that number of objective findings, the record also reflects a disturbing number of hospital visits where Prate seemed to exaggerate his symptoms in order to receive prescription opioids. ALJ Fina did the hard work of cataloguing these incidents (R. 19-23, 26-30), so this opinion will summarize just one by way of example. On June 26, 2009 Prate reported to an emergency room complaining of extreme pain through his back and leg, but his attending nurse noted that he moved easily about the room and was not grimacing or showing other typical signs of pain (R. 463). Prate refused non-pharmacological treatments such as ice, and he also refused to see a social worker about getting assistance with housing or with obtaining Coumadin, a medication necessary to control his recurrent pulmonary embolisms (R. 462-63). Instead Prate repeatedly demanded that he be given powerful opioids intravenously (R. 463). He refused all offers of other help, verbally abused a doctor who refused to prescribe the specific drug Prate was demanding and finally left the emergency room against medical advice (R. 463-64). Prate did leave in a wheelchair, although it is not clear whether he physically required one (R. 464). Descriptions of several similar hospital visits, with similar behavior on Prate's part, are scattered throughout the record.

To move on to Prate's heart condition, he had a heart attack with subsequent stenting in 2006, although it is unclear from the record whether that occurred before or after the alleged disability onset date of April 15, 2006 (R. 55). Prate apparently did not start reporting to emergency departments with complaints of chest pain and dyspnea (shortness of breath) until late 2009, when visits from August (R. 2117-23), September (R. 1380-82) and December (R. 5978) of that year all record such complaints. After further chest-pain-related visits in 2010

and early 2011 (e.g. R. 5960-74, 3354-58, 5620-21), Prate was admitted to Elmhurst Memorial Hospital on March 11, 2011 for chest pain that was "[s]uspicious for angina," according to the attending physician (R. 5660). But the cardiologic stress test came back negative, and Prate consistently demanded opioids throughout his hospital admission -- demands that appear to have made the medical staff dubious about his purported symptoms (R. 5662). After that hospital visit Prate went over a year without seeking treatment for chest pain or shortness of breath. Then on May 23, 2012 Prate again sought emergency medical care for chest pain that radiated into his jaw and arm (R. 7323). Again a stress test came back negative (R. 7334), but a catheterization study showed a 40% stenosis (narrowing) of the left circumflex artery, two stenoses (of 20% and 30%) in the left anterior descending artery, a 20% stenosis in the first obtuse marginal artery and a 30% stenosis in the right coronary artery (R. 7379). Notes by the doctor performing the catheterization study included "Unstable angina" and "Functional status: CCS [Canadian Cardiovascular Society][2] class III (marked limitation of ordinary activity)" (id.).

If there had been any doubt as to whether Prate really had heart trouble, it was resolved on November 2, 2012, when Prate suffered a massive heart attack while picking up a prescription at the Jesse Brown Veterans Administration ("VA") Hospital (R. 7877). Physicians performed an emergency left heart catheterization and placed two more stents into Prate's heart (id.). Prate

_____

[2] That Society's classification system for grading the severity of angina pectoris "has gained widespread popularity" among cardiologists (Andrew Cassar et al., Chronic Coronary Artery Disease: Treatment and Management, 84 Mayo Clinic Proceedings 1130, 1131 (2009)). In patients with class III angina, "[a]ngina occurs with mild exertion (walking 1 or 2 blocks on level ground and climbing 1 flight of stairs in normal conditions and at a normal pace)" (id.). Angina symptoms include both chest pain and shortness of breath (see Dorland's Illustrated Medical Dictionary 83 (32d ed. 2012)).

reported no chest pain or shortness of breath during his hospital visits after that heart attack (R. 8988, 8993, 8999).

Finally, Prate has some history of mental health problems. During his recurrent emergency department visits Prate occasionally reported suicidal thoughts (e.g. R. 552, 3358). On September 25, 2010, a day after overdosing on a muscle relaxant, Prate was examined by a psychiatrist, Dr. Cullinane (R. 5573-75), who diagnosed major depression, opiate abuse and sedative-hypnotic abuse (R. 5574). About two years later (August 29, 2012) Prate was examined by a VA psychologist, Dr. Eisenberg (R. 7484-85), who diagnosed Prate with an adjustment disorder with mixed emotional features (R. 7484).

### Prate's Hearing Testimony

Prate testified at both ALJ hearings (on October 2, 2012 and February 4, 2013), discussing his work history, medical symptoms and daily life. Prate said he had previously worked as a semi-truck driver, auto salesman, retail flooring salesman and over-the-phone computer salesman (R. 103-6). He testified that he had to stop driving trucks because he could no longer hold in the clutch and because the constant vibrations from sitting in a truck cab caused him intolerable pain (R. 107-8). Prate said he could not return to work as a salesman because he could neither sit nor stand for extended periods and because his prescribed pain medications interfered with his ability to work (R. 107, 114-15).

As for his medical conditions, Prate described his chronic back pain this way (R. 77):

> Low back, right around the low belt level, shoots down into the leg, the burning sensation into the big toe and toe next to it. Absolutely excruciating, so much so that the Dilaudid [hydromorphone] doesn't even stop the burning sensation.

Prate also testified that his back pain had "gotten a lot worse" since 2006, that the pain was brought on by "[s]itting, moving, walking, sneezing, coughing," and that he had difficulty with

his balance due to the burning sensation in his leg (R. 115-116). Prate appeared at the hearings using a walker and reported that he used a walker four or five times a week (R. 120) and that he walked without a cane or walker only when going short distances (R. 121). During the February 4, 2013 hearing Prate testified that he had gone to the emergency room 8 or 9 times in the past 14 months for breakthrough pain and shortness of breath (R. 78). As for pain medications, Prate reported current (as of the October 2, 2012 hearing) prescriptions of the opioids Dilaudid (hydromorphone) and Norco (hydrocodone), the muscle relaxant Soma (carisoprodol) and the non-opioid painkiller Neurontin (gabapentin) (R. 117).

Prate also described his heart condition. Although he reported recent chest pain at the October 2, 2012 hearing (R. 130), he said he was not currently experiencing chest pain (R. 131). At the second hearing, which took place after his massive heart attack of November 2, 2012, Prate did not complain of chest pain (R. 77-79). At both hearings, though, Prate testified that he experienced shortness of breath that kept him from even mild exertion. In the first hearing he clarified, "I mean exertion, walking, I mean to me that's exertion" (R. 131). In the second hearing he said he often was "very short winded. I have a very hard time catching my breath. I can't walk for very long distances at a time" (R. 77). Prate also said he sought medical treatment in emergency rooms so often both because of back pain and because of "shortness of breath, can't breathe" (R. 78) and because he had been suffering from recurrent pneumonia (R. 79).

Prate testified that he experienced depression and anxiety and had been diagnosed with post-traumatic stress disorder. He described his depression as being related to his chronic pain (R. 113-14, 127) and said he had received treatment for depression at pain clinics (R. 117). Prate also described a traumatic incident in his past (a schoolteacher's assault on Prate's daughter when she was a child) as contributing to his depression, and he said he had been diagnosed with

post-traumatic stress disorder in relation to that event (R. 127-29). Prate asserted he still experienced depression and post-traumatic stress disorder, but he did not say if or how that limited his ability to work (R. 132-33).

As for activities of daily life, Prate testified that he occasionally took public transportation a distance of 8 blocks -- a bus picked him up directly in front of the shelter where he was living and dropped him off at a VA medical center down the street (R. 109). He said he could walk no more than a block before he had to rest because of pain and shortness of breath (R. 115, 131). At the October 2, 2012 hearing Prate stated he did not cook, clean or do other chores "due to the fact of my disabilities" (R. 110). He testified that while he had earlier lived in a friend's house, other people grocery shopped for him, but he had prepared his own food using a microwave (R. 109, 137). There was a public library a half-block to a block away from that house, and Prate would go to the library several times a day to use the internet (R. 111, 136). He explained that he went back and forth so often because his pain was more bearable if he changed position often (R. 136).

### Medical Expert's Hearing Testimony

Sheldon Slodki, M.D. testified as a medical expert at the February 4, 2013 hearing. His testimony was based entirely on the record -- he did not examine Prate. As to Prate's statements about back pain, Dr. Slodki said (R.60-61):

> [T]he pain symptom isn't always correlatable with the physical finding, with the findings on the various x-ray studies that are done. He doesn't have evidence of severe radiculopathy with motor loss, with bowel and bladder loss, with many of the findings associated with severe L4 problems, spine problems. So that it's, it becomes a matter of, of credibility rather than objective findings.

Dr. Slodki did not discuss any of the MRI or CT scans specifically, nor did he address any of the other objective findings related to back pain in the record. When Prate's counsel pointed out that

the record in fact showed that Prate had reduced reflexes in his legs, Dr. Slodki responded, "A lot of things can reduce reflexes" (R. 67).

As for Prate's heart condition, Dr. Slodki testified that it was not worsening before Prate's November 2, 2012 heart attack (R. 61). He based that conclusion on a negative stress test performed on May 24, 2012 (R. 61-62), but he did not at any point mention the angiographic catheterization study performed the very next day, that appears to have resulted in more troubling findings.[3] As for Prate's November 2, 2012 heart attack, Dr. Slodki stated that "the prompt treatment for his coronary problem turns the clock back" to the condition Prate's heart was in before the heart attack (R. 64).

## Vocational Experts' Hearing Testimony

Two vocational experts testified: Steven Sprower ("Sprower") at the October 2, 2012 hearing and James Breen ("Breen") at the February 4, 2013 hearing. Sprower testified that a person who was at least 50 years old, who could perform only sedentary work and who was limited to simple, routine and repetitive tasks due to pain would be unable to perform work in the national economy (R. 141-42). Sprower also testified that Illinois employers are unlikely to tolerate more than 6 to 8 absences per year for employees doing unskilled work (R. 142).

Breen testified that a person who could do light work (i.e. could stand or walk for up to 6 hours per day and occasionally balance, stoop, kneel or crawl), but who had to avoid heights and environmental irritants, would be able to perform Prate's past relevant work in auto sales and telephone sales (R. 87). If such a person were instead limited to sedentary work, the only past job of Prate's he would be able to perform would be in telephone sales (id.). But if such a person

_____

[3] Although the studies occurred on consecutive days, the stress test was in hearing Ex. 16F and the angiographic study was in hearing Ex. 20F.

were also limited to simple or routine tasks -- regardless of whether he could perform light or only sedentary work -- he would not be able to perform any of Prate's former occupations (R. 88).

## ALJ's Decision

ALJ Fina made these findings (paraphrased here, except when the particular words the ALJ used are important):

1.   Prate met the insured status requirements (relevant for his social security disability insurance application) through September 30, 2011 (R. 17).

2.   Prate did not engage in substantial gainful activity after April 15, 2006 (R. 17).

3.   Prate had these severe impairments:  degenerative disc disease, thrombophilia, coronary artery disease, pulmonary embolism, irritable bowel syndrome, remote history of calcaneus fracture and a narcotic (i.e., opioid) substance abuse disorder (R. 18).

4.   Prate's substance abuse disorder satisfied the requirements of the 12.09 and 12.08 listings (substance abuse disorder and personality disorder) (id.).

5.   If Prate "stopped the substance use," he would still suffer from severe impairments (id.).

6.   If Prate "stopped the substance use," he would not have any impairments meeting the listing requirements in Reg. § 404, Subpt. P, App. 1 (R. 25).

7.   If Prate "stopped the substance use," he would have a residual functional capacity ("RFC") enabling him to perform light work with limitations

related to balancing, bending down, using heavy machinery and being exposed to environmental irritants (R. 26).

8. If Prate "stopped the substance use," he would be able to perform his past work as an auto salesman, telephone salesman and construction manager (R. 34).

9. Therefore, "because the claimant would not be disabled if he stopped the substance use," his substance use disorder is a contributing factor (i.e., it is material) to the determination of disability, and thus in turn Prate was not disabled at any time from April 15, 2006 to the date of the decision (id.).

## Standard of Review and Applicable Law

This Court reviews the ALJ's decision as Commissioner's final decision, considering the legal conclusions de novo (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005)).  By contrast, factual determinations receive deferential review, and courts may therefore not "reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision "if it is supported by substantial evidence" (id.).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks and citations omitted)).

Credibility determinations receive an even more deferential review.  Courts can reverse or vacate an ALJ's credibility findings only when the findings are "patently wrong" (Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008)).  Still, ALJs commit reversible error when they ground their credibility determinations upon "errors of fact or logic" (Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006)).

As cases such as <u>Haynes</u>, 416 F.3d at 626 (internal quotation marks and citation omitted) teach:

> In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion. The ALJ need not, however, provide a complete written evaluation of every piece of testimony and evidence.

Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (<u>Villano v. Astrue</u>, 556 F.3d 558, 562 (7th Cir. 2009)). Rejection is also required if the ALJ has committed an error of law, regardless of how much evidence supports his or her factual findings (see <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (<u>Liskowitz v. Astrue</u>, 559 F.3d 736, 739 (7th Cir. 2009), citing Section 423(a)(1)(E)). Disability is defined in Section 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[4]

<u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir.1995) sets out the customary five-step inquiry prescribed by Reg. § 404.1520(a)(4)[5] for determining whether a claimant is disabled:

(1)     whether the claimant is currently employed;

_____

[4]  Section 423 governs SSDI claims, while Section 1382 governs SSI claims. Typically the two statutes use identical language, with some minor variations in wording that do not reflect substantive legal differences. For the sake of brevity, this opinion will cite only to Section 423 -- except of course in instances where it materially diverges from Section 1382 (or from Sections 1382a, 1382b, 1382c, etc.).

[5]  Reg. § 404 governs social security disability, while Reg. § 416 governs supplemental security income. As with the statutory provisions, this opinion will cite to Reg. § 404 except where the regulations diverge materially.

(2)    whether the claimant has a severe impairment;

(3)    whether the claimant's impairment meets or equals one of the impairments

listed by the [Act], see 20 C.F.R. § 404, Subpt. P, App. 1;

(4)    whether the claimant can perform [his] past work; and

(5)    whether the claimant is capable of performing work in the national

economy.

To receive disability benefits, an applicant for social security disability insurance must also meet the insured-status requirements outlined in Section 416(i)(3). That means (for his disability insurance claim only) Prate must show he was under a disability after his alleged disability onset date of April 15, 2006 but before his insured status expired on September 30, 2011 (Reg. § 404.131(a); Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011)). For Prate's supplemental security income application, he can establish disability at any time between his application date of November 2, 2011 and the present (see Reg. §§ 416.200, 416.202(g)).

### Flaws in the ALJ's Opinion

Prate makes essentially three arguments on appeal: (1) substantial evidence did not support the ALJ's finding that Prate could stand or walk for 6 hours out of an 8-hour workday, (2) the ALJ failed to consider properly the effects of Prate's mental impairments in determining his RFC and (3) the ALJ failed to consider the effect of Prate's impairments in combination in determining his RFC. In response Commissioner essentially contends that the ALJ's determination of Prate's ability to walk and stand was based on his assessment of Prate's credibility, which finds ample support in the record, and that Prate's arguments about how the ALJ treated his mental impairments are based on a mistaken reading of the ALJ's opinion and the

record.[6]  Although Commissioner is right on both of those points, that turns out not to be determinative.  Instead this Court agrees with each of Prate's contentions, though not for the reasons Prate advances, so that the case must be remanded to Commissioner.

**Prate's Ability To Stand and Walk**

ALJ Fina found that Prate could perform "light work," with some additional limitations based on posture (e.g., only occasional kneeling or crouching) and on environmental factors (e.g., no exposure to respiratory irritants) (R. 30, 32).  Light work, or work at the light "exertional level," requires a person to stand or walk for up to 6 hours per 8-hour workday (Reg. SSR 83-10 Glossary).

In determining that Prate could do light work, the ALJ necessarily found Prate's statements about the severity of his pain and dyspnea lacking in credibility.  In so finding, the ALJ catalogued exhaustively instances in the record where Prate exaggerated his pain (or otherwise acted deceptively) so that doctors would prescribe opioid pain medication (R. 26-30).  ALJ Fina remarked that "physical examinations and radiologic studies . . . have failed to corroborate the claimant's statements regarding the degree of pain and functional limitation" (R. 27, with similar statements at R. 30, 34).  He also noted that he accorded great weight to the opinion of Dr. Slodki, the independent medical expert who reviewed the record and testified at the second hearing, both as concerning Prate's back pain and as concerning Prate's coronary artery disease (R. 32-33).  Specifically, the ALJ agreed with Dr. Slodki (1) that Prate was capable of light work despite whatever pain he experienced and (2) that after Prate's most recent

_____

[6]  Other arguments Commissioner advances either violate the principles set out in <u>SEC v. Chenery</u>, 318 U.S. 80, 87-88 (1943) or rest upon some combination of inexcusably misleading citations and ad hominem remarks.  Such arguments are completely baseless, and the United States Attorney's office ought to know better than to make them.

heart attack "the clock had been essentially turned back to the time prior to the heart attack and the results are good" (id.). And the ALJ found not credible two medical opinions that supported Prate's statements that his pain and dyspnea were disabling, one from an examining physician (Dr. Philip Van Reken) and one from a certified nurse practitioner (Kevin Barrett) (R. 33).

## ALJ Fina's Treatment of Prate's Asserted Pain

It is indisputable that the record recounts many instances (not a few of them egregious) where Prate apparently exaggerated his symptoms and engaged in "drug-seeking behavior."[7] That might well undercut any conclusion that the ALJ was patently wrong to find that Prate experienced only "some residual pain and limitation" from his 1999 fusion surgery (R. 30) and could still walk or stand for 6 hours per day. Ordinarily courts "merely examine whether the ALJ's determination [of credibility] was reasoned and supported" (Elder, 529 F.3d at 413), and Prate's history of deception provides support for the ALJ's determination. But despite that history the ALJ's opinion repeatedly misstates the contents of the record and, on the whole, betrays no awareness of the extensive record evidence supporting Prate's claims of disabling back pain and heart trouble. So this case presents one of the (fortunately) rare instances where the ALJ relied on fundamental "errors of fact or logic" (Allord, 455 F.3d at 821) committed in his deciding the issue of credibility, in that "the reasoning process employed by the decision maker exhibits deep logical flaws" (Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004)). Hence this Court has no choice but to remand the case for further proceedings.

_____

[7] The term is apparently disfavored in some clinical settings (see Margo McCaffery et al., On the Meaning of "Drug-Seeking", Pain Mgmt. Nursing 122-36 (Dec. 2005)), but it has gained currency with our Court of Appeals as a shorthand for use in Social Security cases where a claimant has "obtained, or attempted to obtain, pain medication by deceiving or manipulating a medical professional" (Kellems v. Astrue, 382 F. App'x 512, 515 (7th Cir. 2010)). Though Kellems is non-precedential, it usefully collects cases dealing with drug-seeking behavior (id.).

As has been noted, the ALJ seeks to support his credibility determination with statements to the effect that no objective medical findings such as MRI and CT scans support Prate's assertions about pain (R. 27, 30, 34). That is flatly untrue. MRI and CT studies of Prate's back have uncovered narrowing of the neural foramina (R. 832[8], 5870), degeneration of the spinal joints (R. 6862-62), disc bulging (R. 1746-47, 7453), atherosclerosis of the blood vessels around the spine (R. 5078) and at least one perineural cyst (R. 1787-88). Because all of those are objective findings that could support complaints of severe back pain, the ALJ was obliged to address them. More specifically, because the ALJ is not a physician equipped to interpret those findings (and, of course, neither is this Court), the ALJ was obliged to submit them to medical scrutiny (see Goins v. Colvin, --- F.3d ---, 2014 WL 4073108 at *3 (7th Cir. Aug. 19)). That goes as well for the other objective findings that imply nerve damage or unfeigned back pain: back spasms (R. 5040, 5932, 6041, 6139), incontinence (R. 7499, reflecting the one occurrence that hospital staff might have observed) and reduced reflexes in Prate's lower extremities (R. 818, 1746, 4123, 4891). But the ALJ did not ask Dr. Slodki about any of those findings, nor did Dr. Slodki address them himself.[9]

_____

[8] ALJ Fina does list "mild to moderate bilateral foraminal narrowing at multiple levels" among CT scan findings at R. 28. But the ALJ includes that finding in a section he leads off with the observation that "radiologic studies . . . have failed to corroborate the claimant's statements regarding the degree of pain and functional limitation" (R. 27). Without further explanation, the only conclusion to be reached is that the ALJ thought moderate foraminal narrowing (i.e., spinal stenosis) could not cause Prate's stated symptoms. But that is plainly inaccurate. One common symptom of spinal stenosis is "pain in the back, buttocks, thighs, or calves. . . . Most people with spinal stenosis cannot stand or walk for a long period" (Spinal Stenosis, U.S. National Library of Medicine, avail. at http://www.nlm.nih.gov/medlineplus/ency/article/000441.htm (last visited Sep. 22, 2014)).

[9] Dr. Slodki's response to the one question from Prate's counsel about the significance of Prate's diminished reflexes --"A lot of things can reduce reflexes" (R. 67) -- is about as unhelpful
(continued)

Even more troubling than the ALJ's failure to ask Dr. Slodki about a single one of those objective findings is the fact that elsewhere in his opinion the ALJ often cites to the very radiologic studies that made those findings -- but he passes over the findings themselves in silence.[10] Just one example of that unfortunately endemic feature of the ALJ's opinion is his summarization of an August 6, 2012 MRI (R. 30):

> As has been the case with all the claimant's other hospitalizations, the radiologic studies have failed to show any significant abnormality, which would account for the severity of the claimant's purported pain.

To the contrary, the very pages that the ALJ cites read in relevant part (R. 7453):

> Degenerative disk disease in the lumbar spine. Broad based disk bulges or small protrusions at L2-3 and L3-4 appreciated.

It is universally held that an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion" (Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) and cases cited there, as well as numerous post-Herron decisions). And it is especially important for ALJs to observe that rule in cases such as Prate's, in which the record contains powerful evidence both in favor of and against the credibility of the claimant's statements. It cannot be said that the ALJ's failure to do so here is harmless because, had the ALJ considered all the evidence, he could surely have concluded reasonably that Prate really does (or did) suffer from disabling pain.

_____

(footnote continued)

a response as a medical expert can give. It strengthens this Court's sense that Dr. Slodki gave the record evidence as to Prate's back condition only a cursory review at best.

[10] Just as disturbingly, the ALJ never once mentions what every radiologist conducting an MRI or CT scan scrupled to note: that the residual hardware from Prate's 1999 surgery rendered it difficult or impossible to examine the very portion of Prate's spine (L5-S1, and sometimes L4) that would have been likely to cause the pain he described (see R. 831, 833, 1184, 1787, 3066, 4864, 5078, 5237-38, 6862-63, 7453). One neurologist, Dr. Chenelle of Central DuPage Hospital, even noted "suspected adjacent level disease" (spinal deterioration at the site of a prior fusion) in a consultative evaluation of Prate on March 25, 2009 (R. 6041).

In that respect <u>Gowell v. Apfel</u>, 242 F.3d 793, 797 (8th Cir. 2001) observed there is nothing inherently inconsistent about finding a claimant suffers both from disabling pain and an addiction to pain medication. Therefore a remand is required.

**Prate's Ability To Stand and Walk:  Opinion Evidence of Back Pain**

As to just where the ALJ went off the figurative rails so badly, the prime candidates appear to be (1) the overbroad reading that the ALJ gave to independent medical expert Dr. Slodki's really vague and incomplete testimony on the subject of Prate's pain, coupled with (2) the ALJ's own decision to disregard the opinion of examining physician Dr. Van Reken. That combination, like the well-known (and well-worn) GIGO[11] acronym in computer lore, inevitably had to produce an erroneous result.

As for the first of those two factors, ALJ Fina said that Dr. Slodki testified that there were not "<u>any</u> significant objective findings associated with L4 spinal problems" (R. 33, emphasis added). But in fact Dr. Slodki's testimony was not so categorical (R. 61, emphasis added):

> [T]he pain symptom isn't always correlatable with the physical findings . . . He doesn't have evidence of severe radiculopathy with motor loss, with bowel and bladder loss,[12] with <u>many</u> [not "any"] of the findings associated with severe L4 problems, spine problems.  So that it's, it becomes a matter of, of credibility rather than objective findings.

_____

[11] "Garbage in, garbage out."

[12] Dr. Slodki's testimony on that point is factually incorrect, as the record reflects four asserted instances of incontinence, and one more that it seems medical staff observed (R. 7499). Because Dr. Slodki testified based solely on the record, the ALJ erred to the extent he relied on Dr. Slodki's statements that were contradicted by that record (see <u>Beardsley v. Colvin</u>, --- F.3d ---, 2014 WL 3361073 at *5 (7th Cir. July 10).  Also, as previously noted, Dr. Slodki did not discuss the other objective findings supporting Prate's assertions.

- 20 -

That "m" in "many" is an important one, for it torpedoes the ALJ's misreading of Dr. Slodki's testimony.[13] Rather Dr. Slodki was simply stating the obvious: that because Prate's complaints of pain were not accompanied by "severe" neurological dysfunction and not "always" supported by physical findings, the ALJ had to make a credibility determination. But once again the obligation to determine credibility is not an invitation to fail to account at all for substantial record evidence that supports the claimant's credibility.

As to the second of the two factors, ALJ Fina's flawed treatment of Prate's credibility is also marked by his decision (R. 33) to disregard the opinion of Dr. Van Reken, who expressly diagnosed Prate with failed back syndrome, degenerative disc disease, spondylolisthesis and spinal stenosis (R. 4891). That was clear error. Dr. Van Reken was an examining physician, and ALJs are generally required to give examining physicians' opinions more weight than those of non-examining physicians (such as Dr. Slodki) (see Reg. § 404.1527(c)). To be sure, ALJs can disregard the opinions of examining physicians "only for reasons supported by substantial evidence in the record" (Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) (per curiam)), but here the ALJ gave none -- and indeed his mistreatment of Dr. Van Reken's medical opinion suggests an effort to avoid, rather than reasonably account for, contradictory evidence of record.

Thus, for example, the ALJ cites only to a letter that Dr. Van Reken wrote referring Prate to a pain clinic, omitting Dr. Van Reken's much more extensive notes from a consultative

_____

[13] Of course, since Dr. Slodki nowhere mentions the objective findings in the record, he may very well have thought, incorrectly, that there were none.

examination of Prate (R. 4890-91).[14]  ALJ Fina also stated that "Dr. Van Reken did not provide

any specific physical restrictions for the claimant" (R. 33), but that too is inaccurate.  Dr. Van

Reken noted Prate moved with a limp, had a limited range of motion in his back and required a

walker (R. 4891) (and see also Prate's hearing testimony that Dr. Van Reken had prescribed a

walker for his use, R. 120).[15]  And the ALJ made much of the "fact" (quite untrue) that Dr. Van

Reken made "no mention whatsoever of the claimant's longstanding history of drug abuse or

drug-seeking behavior" (R. 33).  To the contrary, Dr. Van Reken wrote that Prate was already

known at Elmhurst Memorial Hospital's Pain Center (where Dr. Van Reken examined Prate),

specifically mentioning Prate's history of overdose (R. 4890).

      If on remand other reasons were to be assigned for reaching the same destination of

discrediting Dr. Van Reken, it is worth noting that such an effort might run aground on the

shoals of logic.  Remember that the ALJ credited Dr. Slodki (R. 32), who credited and relied on

the RFC analysis performed on December 12, 2011 by Dr. Pardo (R. 63-64), who in turn based

his analysis entirely on the findings of none other than Dr. Van Reken, to whom he refers by

name (R. 7064).  There might perhaps be grounds for disregarding Dr. Van Reken's opinion even

while crediting the physicians who in turn credited Dr. Van Reken.  But the ALJ cannot arrive at

such a conclusion by fiat -- he must give reasons supported by substantial evidence of record.

_____

[14]  That is particularly troubling, considering that Prate and his counsel specifically relied
on the opinions of Dr. Van Reken in their statements and submissions to the ALJ (e.g. R. 120,
210).  Unfortunately it fits a pattern of selective citation evident throughout the ALJ's opinion.

[15]  Commissioner and Prate devoted much of their opposing submissions to arguing about
whether Prate needed a walker, a cane or neither.  Those arguments were needlessly complicated
by the ALJ's failure to make function-by-function findings as required by SSR 96-8p.  On
remand the ALJ should make explicit findings about Prate's ability to walk or stand that include
consideration of Prate's need or lack of need for a cane or walker.

## ALJ Fina's Treatment of Prate's Coronary Artery Disease

Even apart from the issue as to Prate's asserted back pain, there is an independent error in the ALJ's implicit determination that Prate could stand or walk for 6 hours per workday. Both Dr. Slodki and the ALJ overlooked (a charitable characterization) an angiographic study performed on May 25, 2012 that showed several stenoses in Prate's heart and described him as suffering from class III angina (R. 7379-81). That omission is significant in three respects, described next in this opinion.

First, Dr. Slodki's opinion (on which, it will be remembered, the ALJ explicitly relied) was that the quick treatment of Prate' second heart attack "turn[ed] the clock back" and put Prate back into his pre-heart-attack condition (R. 64). But if Prate's prior situation was much more grim than Dr. Slodki realized as a result of his overlooking the angiographic study, Dr. Slodki's statement about the clock turning back is either dead wrong or, if literally correct in terms of what Dr. Slodki thought to be the case, would tend to support rather than undermine Prate's claim for disability. Second, as for that second heart attack that befell Prate on November 2, 2012 (R. 7877), the combination of it and the May 25, 2012 study lends material weight to Prate's statements at the October 2, 2012 hearing that he was suffering from disabling shortness of breath (R. 131). On remand it will be necessary to reconsider the credibility of Prate's statements about the severity of his angina, including shortness of breath, in light of the overlooked study. And third, the combination of multiple stenoses in Prate's heart plus the severity of the symptoms that he described appear to meet the severity of impairment described by the listing for coronary artery disease found at Reg. § 404, Subpt. P, App. 1, 4.04(A)(1). That required ALJ Fina to consider whether Prate's heart condition was medically equivalent to that

listing despite not meeting its specific requirements (see Reg. § 404.1526(b) and (e)).  Because

he did not, that inquiry must be made on remand.

One essential corollary of the necessary reconsideration already called for by this opinion

should also be noted.  It may be an obvious point, but it is worth repeating in a case with a record

as extensive and a timeline as muddled as this one, that ruling on Prate's SSI and SSDI

applications requires looking at two different time periods.  For SSDI purposes an ALJ is

required to determine whether Prate was disabled for a period of at least 12  consecutive months

(or, alternatively, actually became disabled) during the period stretching from April 15, 2006 to

September 30, 2011 (see Reg. § 404.315(a)(3)-(4)).  But for SSI purposes the ALJ will need to

look at Prate's present condition (and recent medical history, naturally) (see Reg. §§ 416.200,

416.202).  Hence even if it is determined on remand that Prate no longer suffers from disabling

pain or shortness of breath, Prate may still be owed insurance benefits for an earlier period of

disability.

## Prate's Mental Impairments

In light of the huge record described at the outset of this opinion, it may not be surprising

(though it is admittedly depressing) that the exhaustive (and exhausting) discussion to this point

has not yet reached the end of the analytical road, for Prate also takes issue with two aspects of

the ALJ's findings about his purported mental impairments.  First he says that the ALJ found he

had a personality disorder but did not sufficiently explain why that personality disorder would no

longer be disabling if Prate stopped his substance abuse.  Prate's other argument is that the ALJ

failed to take account of Prate's adjustment disorder, which VA psychologist Dr. Eisenberg

diagnosed on August 29, 2012 (R. 7483).  In those respects Commissioner responds that Prate

has misread the ALJ's opinion and, as for the adjustment disorder, that the diagnosis is irrelevant because Prate never asserted any functional limitations related to it.

First, as to the purported personality disorder, Prate's vigorously advanced assertions (P. Mem. 10-12; P. R. Mem. 1-3) are simply wrong: ALJ Fina never found that Prate suffered from a personality disorder independent of his substance abuse disorder. ALJ Fina's statement that Prate met the listing for both 12.08 (personality disorders) and 12.09 (substance addiction disorders) (R. 18) is clearly a reflection of 12.09's incorporation by reference of the elements of each previously-listed mental impairment, including 12.08. So that aspect of Prate's argument fails.

As for the adjustment disorder, although it may have been erroneous to overlook it, that does not matter because any error in that respect was harmless. As Commissioner correctly states, Prate never asserted any functional limitations related to his diagnosed adjustment disorder (or depression, a diagnosis that Prate forgot to raise, R. 5573-75), and the "social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment" (Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005)). In light of the total lack of evidence of a severe impairment, as McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011) teaches, "[i]t would serve no purpose to remand this [issue] to the ALJ for a statement of the obvious."

There is, however, a more fundamental error related to Prate's mental impairments that cannot be discounted as harmless: the ALJ's failure to consider the side effects of Prate's prescribed pain medications. In that respect the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" are a mandatory subject of inquiry in determining disability (SSR 96-7p). In this instance Prate's

testimony that he could not do sales work because of his medication (R. 107), along with other record evidence describing the seriousness of side effects such as drowsiness caused by his medication (e.g. R. 71-72, 7131), was enough to raise the issue of an impairment resulting from drug side effects. As Scott v. Astrue, 647 F.3d 734, 741 (7th Cir. 2011) teaches:

> If the ALJ found this evidence insufficient, it was [his] responsibility to recognize the need for additional medical evaluations.

Instead of developing the record in that important area, though -- indeed, instead of addressing the side effects of Prate's prescription medication at all -- the ALJ made the wholly unsupported assumption that Prate could stop taking his prescribed pain medications altogether. In fact the ALJ premised his analysis of whether Prate's substance abuse was material on a hypothetical situation in which Prate "stopped the substance use" (R. 23, 25-26, 34-35, emphasis added) instead of substance abuse. Yet there was no medical or other evidence that Prate could stop taking prescription pain medication full-stop. Even doctors who were aware of Prate's substance abuse problem, such as the physicians at the Jesse Brown VA Hospital, maintained Prate on prescription opioids (R. 8934-35). "Without expressly relying on any medical evidence or authority" that Prate could be weaned completely off of prescription opioids, the ALJ was not free to "play doctor" and decide that medical question himself (Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996)). So on remand findings will need to be made on the severity of the side effects of Prate's medication when taken as prescribed, with further development of the record if necessary, and with those side effects being taken into account in determining Prate's RFC.

## Prate's Impairments in Combination

That is at last the end of the analytical road as to the numerous individual components of the ALJ's errors -- but it is not the entire story. Finally, remand also is required because the ALJ

never considered Prate's impairments in combination, as he was obliged to do (see <u>Gentle</u>, 430 F.3d at 868-69 (7th Cir. 2005) and Section 423(d)(2)(B)). ALJ Fina included some boilerplate to the effect that if Prate "stopped the substance use" he would not have "a combination of impairments that meets or medically equals any of the impairments listed" in the regulations (R. 25). But after saying so, he proceeded to consider Prate's impairments only in series rather than in their totality (R. 25-32).

That treatment is especially troubling in light of Prate's statement at the hearing that his pain and dyspnea were "all tied into one" and <u>together</u> made it impossible for him to walk more than a block at a time (R. 131). To paraphrase the holding in <u>Barrett v. Barnhart</u>, 355 F.3d 1065, 1068 (7th Cir. 2004), motion for reh'g denied per curiam 368 F.3d 691 (7th Cir. 2004), even if Prate's back pain (or dyspnea) was not particularly serious in itself, it would interact with his dyspnea (or back pain) to make standing or walking for 6 hours at a time more difficult than it would be for a person who had either similar pain or similarly limited breathing but not both. Once more the remand will call for weighing the combined effect of Prate's various impairments.

## Conclusion

Only a small percentage of this Court's caseload (and that of its colleagues) involves Social Security disability appeals. That being so, it is a startling coincidence that the initial assignment for each of its two newly minted law clerks has been in this area -- and it is to be hoped that it is another coincidence, and not indicative of a pervasive problem, that each of the two cases revealed such major deficiencies in its handling by a different ALJ.

This Court is fully aware that the decision as to assignment of the case on remand is for Commissioner to make, and it has always sought to honor that principle. But what this lengthy opinion has revealed calls for a strong recommendation that Commissioner give consideration to

assigning the case on remand to a different ALJ (see, e.g., <u>Sarchet v. Chater,</u> 78 F.3d 305, 309

(7th Cir. 1996), delivering a message given there and all too often since then by our Court of

Appeals).

Because neither party has demonstrated an entitlement to a ruling in his or favor as a

matter of law both of those motions [Dkt. 30 and Dkt. 23] are denied.  But the ALJ's ruling is

unsupportable in a number of respects, so that a remand of the case is necessary and is hereby

ordered.  Lastly, this case (and what was said in the preceding paragraph) calls for adding the

same message as to possible reassignment on remand that this Court delivered in the other

just-completed case.

_____
Milton I. Shadur
Senior United States District Judge

Date:  September 29, 2014